UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA JAVIER,<br><br>                    Plaintiff,<br>     vs.<br><br>CARNIVAL CORPORATION, etc., et al.,<br><br>                    Defendants. | CASE NO. 09cv2003-LAB (WMc)<br><br>**ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |

Maria Javier, a crew member on the Carnival cruise ship Spirit, has sued Carnival for injuries she sustained during an offshore excursion — an all-terrain vehicle tour — when the Spirit was docked in Acapulco, Mexico. Now before the Court is Carnival's motion to compel arbitration in Panama pursuant to an arbitration clause in Javier's employment contract. Javier argues that the arbitration clause is against public policy, and that the employment contract is invalid in the first place.

**I.     Factual Background**

At the time Javier was injured on the ATV tour, she was employed by Carnival as the Shore Excursion Manager on the Spirit; Carnival had asked her to take the tour to evaluate its safety and determine whether it was worth offering to Carnival passengers. It turned out not to be. The ATV in which Javier was a passenger tipped over, landed on the passenger

//

side, and crushed Javier's right arm. She has since undergone eleven surgeries and claims to be permanently disabled and disfigured.

Javier's employment at the time of the accident was governed by a Seafarer's Agreement that she signed on December 15, 2007. The Agreement contains an arbitration clause that provides, in relevant part

> any and all disputes arising out of or in connection with this Agreement . . . shall be referred to and finally resolved by arbitration . . . . The place of arbitration shall be London, England, Monaco, Panama City, Panama or Manila, Philippines whichever is closer to the Seafarer's home country.

(Doc. No. 18.) Javier is a resident and citizen of Peru, so Panama is where the Agreement would require her to arbitrate any claims against Carnival. The Agreement contains additional language, in bold type, that is there to reinforce its binding nature:

> The undersigned Seafarer has read, understands, and accepts the terms and conditions of employment as contained and incorporated herein. It is agreed by and between Seafarer and Carnival that the parties entered freely into this Agreement. It is further agreed by the parties that the language of the Agreement cannot be construed against the drafter because it represents the parties' mutual and bargained for terms and conditions for Seafarer's employment.
>
> In consideration for the offer of employment made herein, Seafarer accepts each and every term and condition of this Agreement, including but not limited to . . . the arbitration/choice of law provisions in paragraphs 7 and 8. Seafarer acknowledges that CCL would not have entered into this Seafarer's Agreement or otherwise employed Seafarer if the Seafarer had not agreed to all such terms and conditions.

(Doc. No. 18.) Finally, the Agreement provides that "the laws of the flag of the vessel" — Panamanian law, in the Spirit's case — will govern all disputes that go to arbitration. Javier admits that she signed the Agreement, but says that she did so under conditions that approximated duress. She explains that the Agreement was presented to her for a signature the moment she boarded the Spirit, and that the circumstances didn't allow for her to read the Agreement carefully or negotiate its critical terms. (Doc. No. 17 ¶ 7.) It had taken Javier eleven hours to get from her home in Peru to California, and all she wanted to do was get her cabin assignment and recuperate before she'd have to start working. (*Id.*) In her words,

> As an employee, I was compelled to sign without reading

> because there are so many tasks to be completed when one first boards the vessel and commences a voyage. I could not receive my cabin keys or unpack luggage until I signed the Carnival contract. This entire event of boarding the vessel, signing the Carnival contract, and receiving cabin keys occurs in a matter of minutes and only after employees have traveled from their home country, passed through immigration, and boarded the vessel.

(*Id.*)

## II.     Legal Background

Javier brings causes of action against Carnival for Jones Act negligence and unseaworthiness, basic negligence, and maintenance and cure. These are standard causes of action for personal injury cases that arise in the maritime context. *See Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1137 (9th Cir. 1998).

To provide context for these claims, the Jones Act is the popular name for Merchant Marine Act, enacted in early June 1920. It provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. The doctrine of seaworthiness refers to a shipowner's duty to keep a vessel in working order. It has been developed "[b]ecause of the unique status of seamen, necessitated by the rigors of the sea." *Hudson Waterways Corp. v. Schneider*, 365 F.2d 1012, 1014 (9th Cir. 1966). Finally, "maintenance and cure" is a common-law maritime remedy that refers to payments employers must make to seaman injured on the job to cover their subsistence (maintenance) and medical expenses (cure). "[A] seaman who falls ill while in the service of his vessel is entitled to . . . maintenance and cure." *Dragich v. Strika*, 309 F.2d 161, 163 (9th Cir. 1962.) The obligation to make payments for maintenance and cure "does not depend on the negligence or fault of the shipowner, nor is it limited to cases in which the seaman's employment caused his illness. Traditionally, courts have construed this obligation liberally." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1044 (9th Cir. 1999).

The Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution," a policy that "applies with special force in the field of international commerce." *Rogers v. Royal Carribean Cruise Line*, 547 F.3d 1148, 1158 (9th Cir. 2008)

(citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). As the Supreme Court stated in *Mitsubishi*, "the concerns of international comity, respect for the capacities of foreign and international tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce [international arbitration agreements], even assuming that a contrary result would be forthcoming in a domestic context." *Mitsubishi*, 473 U.S. at 629.

Not only is there an institutional preference for the arbitration of international disputes, but the arbitration clause in Javier's Seafarer Agreement is presumptively enforceable under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which the United States adopted in 1970. In fact, the Convention embodies this preference. *See* 9 U.S.C. §§ 201–208. Article II(1) of the Convention requires that

> [e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

The Court must compel arbitration pursuant to the Convention, generally speaking, if four jurisdictional prerequisites are satisfied: (1) there is a written agreement to arbitrate; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship that's considered commercial; and (4) a party to the agreement is not an American citizen. *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n. 7). There's no question that the prerequisites are satisfied here.

But, an agreement to arbitrate isn't enforceable if it is "null and void, inoperative or incapable of being performed." Art. II(3). The concern here isn't with the underlying, substantive fairness of an arbitration clause, but rather the validity of, in this case, the Seafarer Agreement that contains that clause. As the Eleventh Circuit explained in Bautista, "[t]he Convention's 'null and void' clause . . . limits the bases upon which an international arbitration agreement may be challenged to standard breach-of-contract defenses." *Bautista*, 396 F.3d at 1302 (internal citations and quotations omitted). It then listed those defenses as fraud, mistake, duress, and waiver, and noted that "[d]omestic defenses to

- 4 -                                        09cv2003

arbitration are transferrable to a Convention Act case only if they fit within the limited scope" of that list. *Id.* The parties appear to disagree on whether domestic or some other law determines the validity of the Seafarer Agreement, but it seems obvious to the Court that domestic law ultimately controls. *See Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007). While Panamanian law may govern the parties dispute *in arbitration*, if the dispute makes it that far, such choice-of-law provisions "say nothing, and mean nothing, as to the threshold issue of arbitrability." *Sea Bowld Marine Group, LDC v. Oceanfast Pty, Ltd.*, 432 F.Supp.2d 1305, 1312 (S.D. Fla. 2006). "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi*, 473 U.S. at 625. As to *that* task, obviously, the Seafarer Agreement's choice of Panama law is irrelevant. To proceed otherwise and actually consult Panamanian law on contract formation would be to treat the Seafarer Agreement as a valid agreement.

Apart from an agreement embodying an arbitration clause being invalid as a matter of contract law, an arbitration clause *itself* may be invalid as a violation of public policy. The concern here is with "choice-of-forum and choice-of-law clauses operat[ing] in tandem as a prospective waiver of a party's right to pursue statutory remedies," specifically those remedies available under United States law. *Mitsubishi*, 473 U.S. at 637 n. 19. That concern is heightened when there is "no subsequent opportunity for review" of an arbitration award. *Vimar Seguros y Reaseguros v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995).

These, then, are the two questions for the Court in this case. First, is the Seafarer Agreement that Javier signed a valid contract? Second, is the arbitration provision in the Seafarer Agreement enforceable, or, on the facts of this case, does it violate public policy? The Court will address these questions in reverse order.

**III.   Public Policy**

The case law in this area, though it varies in subtle ways, is unanimous on the principle first announced by the Supreme Court in *Mitsubishi* and subsequently reiterated in *Vimar*. Courts won't enforce a choice-of-law provision is an international arbitration agreement when doing so would force a plaintiff party to waive claims arising under statute

and risk obtaining no relief whatsoever. *See Balen v. Holland America Line Inc.*, 583 F.3d 647, 654 (9th Cir. 2009) (enforcing arbitration clause with Philippines choice-of-law provision because Plaintiff "has not established what statutory remedy or procedure he could pursue in the United States that he could not pursue in the Philippines"); *Thomas*, 573 F.3d 1113, 1123 (11th Cir. 2009) (finding that plaintiff forced to arbitrate a single Seaman's Wage Act claim in the Philippines under Panamanian law was barred from "relying on any U.S. statutorily-created causes of action"); *Rogers*, 547 F.3d at 1159 (enforcing arbitration clause with Florida choice-of-law provision "in the absence of any evidence that international arbitration would nullify any of the rights Congress has conferred on seafarers"); *Bautista*, 396 F.3d at 1303 (enforcing arbitration clause upon finding that Filipino arbitration law offered meaningful consideration to plaintiffs' personal injury claims); *Bulgakova v. Carnival Corp.*, No. 9-CIV-20023, 2010 U.S. Dist. LEXIS 39231 at *10 (upholding arbitration under Panamanian law because plaintiff's non-statutory maritime claims were capable of arbitration).

Javier brings three causes of action against Carnival. The first is for negligence under the Jones Act, along with unseaworthiness. The second is for general negligence. The third is for maintenance and cure.[1] It will ease the analysis to consider the arbitrability of the statutory and non-statutory claims separately.

### A. Arbitrability of Jones Act Claim

It's a reasonable starting assumption that Javier's Jones Act claim is likely to be a loser in Panama, given that the Act is a creature of American law. Carnival argues, however, that Jones Act claims are perfectly arbitrable, and points to the decisions in *Bautista* and *Bulgakova* as proof. That's a little misleading. In both cases, the plaintiffs brought statutory claims under the Jones Act *and* general maritime claims, and it's clear enough in the respective decisions that the general maritime claims are what carried the cases to arbitration. As the Court in *Bulgakova* explained,

---

[1] In her opposition brief, Javier says she also has a claim for lost benefits and wage under the Seaman's Wage Act, but this isn't pled in her complaint. (Doc. No. 15, p. 26.)

- 6 -

09cv2003

> [C]onsistent with the Eleventh Circuit's pronouncement in *Bautista*, Plaintiff is capable of submitting her non-statutory claims, such as unseaworthiness, to arbitration with every expectation that she may obtain an award and bring an award-enforcement action before this Court to determine whether the arbitrator 'took cognizance of' her statutory claims and 'actually decided them.'

*Bulgakova*, 2010 U.S. Dist. LEXIS 39231 at *11 (citing *Mitsubishi*, 473 U.S. at 638). Moreover, it's unclear what substantive law governed the arbitration in *Bautista*. The decision reveals only that it was to be conducted in the Philippines under Filipino procedural rules, which leaves open the possibility that the arbitration would be receptive to substantive claims grounded in United States law. *Bautista*, 396 F.3d at 1302–03. Just because Jones Act claims went to arbitration in *Bautista* and *Bulgakova* doesn't mean a Jones Act claim can go to arbitration in this case.

      Carnival also relies on *Balen* and *Rogers* to argue that Javier "could arbitrate her claims in Panama and in the event she deems the arbitrator's award inappropriate in failing to consider remedies available under the Jones Act, she could seek review of such award in the U.S." (Doc. No. 24, p. 3.) But that assumes there will *be* an award. This is where *Thomas* is relevant. The problem for the plaintiff in *Thomas* wasn't just that his single arbitrable claim arose under United States law, and that his claims were subject to a Panamanian choice-of-law provision in his employment contract. The bigger problem was that he had no other arbitrable claims to guarantee him "*some* award" that he could, in turn, seek to enforce in an American court, at which time he would also have the opportunity to complain that his statutory claims weren't taken seriously. *Thomas*, 573 F.3d at 1123–24. *Thomas* isn't, as Carnival portrays it, out of line with *Bautista* and *Balen.* *Bautista* went to arbitration, at least in part, because the plaintiff had claims other than the statutory claims that were potentially barred by the law governing the arbitration. *Bautista*, 396 F.3d at 1302–03. In *Balen*, too, the Ninth Circuit allowed the case to go arbitration on the thinking that, even though the plaintiff's sole claim was statutory (under the Seaman's Wage Act), there would be *some* arbitration award that she could move to set aside in a district court. *Balen*, 583 F.3d at 655.

Moreover, there is no indication in the *Bautista* and *Balen* decisions that the law governing the arbitration was inhospitable to the plaintiffs' statutory claims, as is pretty obviously the situation in this case. The Ninth Circuit in *Balen* noted that the plaintiff "has not established what statutory remedies or procedure he could pursue in the United States that he could not pursue in the Philippines. There is no reason to conclude that Philippine arbitrators could not consider an action arising under the [Seaman's] Wage Act." *Id.* *Bautista* is unclear on what country's substantive law was to govern the arbitration, but whatever the answer, the court found that it afforded the plaintiffs meaningful relief for their grievances. *Bautista*, 396 F.3d at 1302–03.[2] This is a very different case, because Javier's claims will certainly be adjudicated under Panamanian law, and her Jones Act claim arises under American law.

Carnival submitted with its reply brief four cases — all from the Southern District of Florida, all involving a seaman's causes of action for Jones act negligence, unseaworthiness, and maintenance and cure — that it believes weigh in favor of sending Jones Act claims to arbitration. They are *Henriquez v. NCL*, *Lindo v. NCL*, *Willis v. Carnival Corp.*, and *Rivas v. Carnival Corp.* With all due respect to the Southern District of Florida, the Court finds only *Rivas* to be persuasive. *Henriquez*, *Lindo*, and *Willis* all found that plaintiffs' Jones Act claims were arbitrable simply because a Jones Act claim was found to be arbitrable in *Bautista*; they distinguished *Thomas* on the ground that the claim at issue arose not under the Jones Act but under the Seaman's Wage Act. But treating *Bautista* as authority on the arbitrability of Jones Act claims and *Thomas* as authority on the arbitrability of Seaman's Wage Act claims is short-sighted. It confuses the ultimate result in a case with the principle behind that result. The plaintiff in *Thomas* did bring a Jones Act claim, but it just so happened that the facts giving rise to it pre-dated the seafarer agreement containing the arbitration clause at issue in the case. That's why *Thompson* doesn't speak to the arbitrability of Jones Act claims. *See Thomas*, 573 F.3d at 1120 n. 9. It's certainly

---

[2] The court in *Bulgakova* said of *Bautista* that "the arbitration provision required arbitration in the Philippines subject to Filipino procedural arbitration rules." *Bulgakova*, 2010 U.S. Dist. LEXIS 39231 at *5.

unreasonable to conclude that it would constitute "an extension" of *Thomas* to find that forcing a plaintiff to arbitrate a Jones Act claim under foreign law would violate public policy.[3] As another decision from the Southern District of Florida put it,

> While Defendant is correct insofar as the Eleventh Circuit's narrow holding in *Thomas* applied only to claims asserted pursuant to the Seaman's Wage Act, a holistic reading of *Thomas* indicates that the Eleventh Circuit's reasoning applies with equal force to claims brought pursuant to the Jones Act. Specifically, I note that the Eleventh Circuit did not focus on the unique nature of the Seaman's Wage Act in reaching its conclusion that foreign choice-of-law and arbitration clauses can — if enforced in tandem — constitute a prospective waiver of statutory rights in violation of public policy. Rather, the Eleventh Circuit focused on the fact that the clauses would "have 'operated in tandem' to completely bar Thomas from relying on *any* U.S. statutorily-created causes of action."

*Cardoso v. Carnival Corp.*, No. 09-CV-23442, 2010 WL 996528 at *3 (Mar. 16, 2010) (quoting *Thomas*, 573 F.3d at 1113). Likewise, the conclusion in *Bautista* that a Jones Act claim was arbitrable had nothing to do with the fact that it was a *Jones Act* claim. It had everything to do with the fact that it was a *statutory* claim that wasn't the plaintiffs' only claim — and that the law governing the arbitration may have been receptive to anyway. *Bautista*, 396 F.3d at 1302–03. It isn't even clear in *Bautista* what country's substantive law would apply in the parties' dispute; in *Henriquez*, *Lindo*, and *Willis* it was obvious that the plaintiffs would be forced to arbitrate under foreign law.

*Rivas*, on the other hand, is a compelling case. In it, the court acknowledged that the plaintiff's Jones Act claim would receive little recognition in an arbitration governed by Panamanian law, and even concluded that "the arbitration clause should not be enforced to the extent it would deprive Plaintiff of his ability to claim Jones Act relief." But the defendant in *Rivas* consented to the application of U.S. law to the plaintiff's Jones Act claim, and in the court's eyes that solved the problem: "Defendant's consent to application within the arbitration of the very law under which Plaintiff seeks to vindicate his rights cures the

---

[3] Carnival explains that "[s]ome courts have expanded the *Thomas* application to Jones Act claims, which the *Thomas* court expressly excluded from its consideration, to find that an arbitration agreement is unenforceable." (Doc. No. 24, p. 5.) But applying a principle announced in one case to another doesn't, at all, constitute the "expansion" of the former case.

deficiency instantiated by potential application of Panamanian law." *Rivas*, 2010 WL 2696676 at *2. *See also Kovacs v. Carnival Corp.*, No. 09-CV-22630, 2009 WL 4980277 at *1 (S.D. Fla. Dec. 21, 2009) (refusing to compel arbitration because defendants would not stipulate to application of U.S. law to plaintiff's Jones Act claim). This explains Carnival's willingness, which it articulates in its reply brief, to "stipulat[e] to application of U.S. law only as to plaintiff's Jones Act claim." (Doc. No. 24, p. 6.)

The Court should also acknowledge *Cardoso v. Carnival*, cited above and referenced by Javier in her opposition to Carnival's motion to compel arbitration.[4] The plaintiff in *Cardoso* brought claims for Jones Act negligence, unseaworthiness, and maintenance and cure against Carnival, and under the terms of her seafarer agreement she was required to arbitrate them in the Philippines under Panamanian law. The court found, first, that proceeding to arbitration under Panamanian law would force the plaintiff to effectively waive his Jones Act claim, and second, that under Panamanian law he may receive no award that would afford him an opportunity for meaningful review. *Id.* at *3. The court still compelled arbitration, though; it just severed from the plaintiff's seafarer agreement the unenforceable choice-of-law provision. *Id.* at *4.

Where does this case law leave the Court? First, there is no authority for the proposition that Jones Act claims are inherently arbitrable. There are cases in which *Jones Act* claims went to arbitration, to be sure, but in those cases — *Bautista* and *Bulgakova* — plaintiffs also brought arbitrable non-statutory claims that guaranteed them *some* award. In other cases in which claims arising under United States law went to arbitration — *Balen* and *Rogers* — there was no indication that the plaintiff would be forced to arbitrate under foreign law that would effectively extinguish those claims. Second, consistent with the decisions in *Rivas* and *Kovacs*, Carnival's willingness to stipulate to U.S. law as it pertains to Javier's Jones Act claim is a substantial concession, and may cure any deficiencies with the arbitration clause. Third, it matters a good deal whether Javier has non-statutory claims that

---

[4] *Pavon v. Carnival* and *Azevedo v. Carnival*, also submitted by Javier, are less helpful. The substantive discussion in *Pavon*, though favorable to Javier, is very brief, and *Azevedo*, as Javier admits, was decided even prior to *Thomas*.

she can pursue with some degree of success under Panamanian law, in order to obtain an award that can be reviewed in an American court. Just like Carnival stipulating to United States law for the purposes of Javier's Jones Act claim, this will overcome the problems associating with arbitrating under a foreign law that isn't receptive to her Jones Act claim.

### B.  Arbitrability of Non-Statutory Claims

It's clear enough that Panamanian law won't recognize Javier's Jones Act claims. But how will her claims for unseaworthiness, basic negligence, and maintenance and cure fare? Not well, according to Javier. Not only does the Seafarer Agreement specify that Panamanian law will govern any disputes with Carnival, it also specifies that "[t]he parties agree to this governing law notwithstanding any claims for negligence, unseaworthiness, maintenance, cure . . . which might be available under the laws of any other jurisdiction." Thus, Javier argues, "Carnival has eliminated, by express language, all remedies that have been traditionally available to seamen for compensating them in the event of negligent injury or unseaworthiness." (Doc. No. 15, p. 8.) What's to prevent Carnival from walking into the arbitration and taking the position that Javier can't maintain a Jones Act cause of action because that arises under United States law, and additionally that she can't maintain causes of action for unseaworthiness, negligence, and maintenance and cure because her Seafarer Agreement explicitly says she can't?

Simple: the words "which might be available under the laws of any other jurisdiction." What the choice-of-law provision requires is that she waive certain non-statutory claims — unseaworthiness, negligence, maintenance and cure — insofar as those claims are defined and construed under any country's law other than Panama's. It doesn't require that she waive those claims *categorically*. If it were otherwise, Carnival couldn't argue in good faith in its reply brief that "Plaintiff's unseaworthiness and maintenance and cure claims, regardless of their validity, are not statutory and are subject to arbitration with a resulting award." (Doc. No. 24, p. 4.) Javier likely understands this distinction, which is why she offers the declarations of three Panamanian lawyers who say the law of their country won't

do Javier justice. (*See* Doc. Nos. 16-2, 21, and 21-1.[5]) The Court focuses on the declaration of Juan Jose Espino. (Doc. No. 16-2.)

The Espino declaration isn't very moving. For starters, much of it has no application to this case. Espino explains that there aren't jury trials for maritime cases in Panama, which is irrelevant given that the operative question for the Court is whether the substantive Panamanian law to be applied in *an arbitration* can accommodate Javier's claims. (*Id.* at ¶ 5.) He also explains that arbitration awards can't be appealed on their merits in Panama, only annulled on the basis of procedural defects in the arbitration. (*Id.* at ¶ 11.) This too is irrelevant because of the ability of a United States court to set aside or modify an arbitration award entered elsewhere. *See Balen*, 583 F.3d at 647. Espino says punitive damages "are not specifically recognized in our legal system," but Javier doesn't seek punitive damages. (*Id.* at ¶ 10.) He says treble damages for unpaid wages aren't available under Panamanian labor law, but Javier doesn't assert any such wage claim in her complaint. (*Id.* at ¶ 12.)

Even Espino's representations about Panama law that may apply to this case don't succeed in establishing that the deck is stacked against Javier. Espino explains that damages for marine-related accidents are capped at $50,000 in Panama, but this says nothing about Javier's ability to obtain the special damages and lost earnings she seeks in her complaint.[6] Espino claims that under Panamanian law, Carnival can't be held liable for an employee's negligent actions unless the employee "was at that time acting upon orders of the employer. Claimant must be able to prove that a co-worker's negligence occurred by orders of the employer." (*Id.* at ¶ 9.) It's not apparent what the problem is here. Must the negligence *proper* be ordered, or just the actions that an employee, in turn, performs in a negligent manner? If the latter, what's to prevent Javier from arguing that her ATV tour chaperones were acting under orders of Carnival to take Javier and others on the excursion?

---

[5] Two of these declarations are identical — those of Maria de Lourdes Marengo and Evans Alberto Gonzalez — and not even original to this case, so the Court is inclined to disregard them. (*See* Doc. Nos. 21 and 21-1.)

[6] The Court would add that despite Javier's claim in her opposition brief that Javier's injuries "are well in excess of $50,000 (Decl. Javier)," Javier's declaration, as far as the Court can tell, says nothing about her actual damages. (*See* Doc. No. 17.)

If the former, perhaps Javier can argue successfully that Carnival instructed the ATV tour chaperones to show its guests a wild ride. But either way, Carnival has indicated a willingness to stipulate to United States law for the purposes of adjudicating Javier's Jones Act claim, and this should ameliorate any concern on Javier's part that her negligence claims against Carnival will go nowhere under Panamanian law. Finally, Espino maintains that Javier's unseaworthiness claim will be dead upon arrival in Panama because "unseaworthiness is a cause for rescision of the labor contract . . . [and] does not apply to personal injuries." (*Id.* at ¶ 13.) Frankly, the Court is suspicious of this statement. In almost all maritime injury cases it has consulted in consideration of Carnival's motion to compel arbitration, unseaworthiness has been one of the claims alleged. It's hard to believe that under Panama law the only point of alleging that a ship is unseaworthy is to get out of a contract to work on that ship.[7] But even if Espino is right, this defect of Panama law alone isn't sufficient to conclude that Javier's non-statutory claims aren't arbitrable in Panama. On the whole, Espino's declaration — where it is not irrelevant — is simply too conclusory and speculative to be persuasive. Espino could have supplemented his legal conclusions with case or statutory authority for emphasis, but he didn't.

Likewise, Javier could have spelled out with specificity precisely how her claims will fail under Panama law, but she hasn't, choosing to rely instead on vague-ish assertions to the effect that it'll be harder to obtain the exact award she seeks under Panamanian law than, presumably, the law of the United States. (*See* Doc. No. 15, p. 15–16.) That is not enough. "The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir. 1992).

//

---

[7] Espino explains that "Law 8 of 1998 considers in its article 53 that unseaworthiness is a cause for rescision of the labor contract." (Espino Decl. ¶ 13.) The Court tracked down a copy of Law 8, and that's true. What Law 8 doesn't suggest, though, is that unseaworthiness can't *also* give rise to civil liability when, owing to a ship's unseaworthiness, a seaman is injured.

The Court is aware that in both *Pavon* and *Kovacs* the Southern District of Florida found that it would violate public policy to force a seaman to arbitrate Jones Act claims under Panamanian law, and that the court made these findings faced with affidavits from Panamanian lawyers similar to the Espino declaration. But Javier's Jones Act claim isn't her only claim, and Javier hasn't shown to the Court's satisfaction that her other, non-statutory claims — for unseaworthiness, for basic negligence, and for maintenance and cure — will fall flat under Panamanian law. The testimony of Espino and Javier's own arguments in her opposition brief are simply too speculative; they fail to nail down just how Panamanian law spells disaster for Javier's claims. The Court has enough confidence that Javier can arbitrate her non-statutory claims and obtain *some* award even under Panamanian law.

### C.     Arbitrability, Overall

Taking the facts of this case and the many cases out there into consideration, along with the institutional preference of American courts for the arbitration of international maritime disputes, the Court finds it would *not* violate public policy to compel Javier to arbitrate her claims in Panama under Panamanian law. Not only has Carnival stipulated to arbitrating Javier's Jones Act claim under United States law, but Javier has presented insufficient evidence that her non-statutory claims will fall flat in Panama. Even under *Thomas*, which is really Javier's best case, the fact that a plaintiff can return from a foreign arbitration with *some* award to enforce and/or challenge in a United States court is sufficient to allay any concerns about the legitimacy of the arbitration. Having reached the conclusion that Javier's claims are arbitrable under the terms of the arbitration clause of her Seafarer's Agreement, the Court now has to ask whether that Seafarer's Agreement is a valid contract in the first instance.

## IV.     Validity of Seafarer's Agreement

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi*, 473 U.S. at 626. Javier's position is that although she signed the Seafarer Agreement, she did so under oppressive circumstances. Not only did Carnival have inherently superior bargaining power, but Javier

was presented with the Agreement on a "take it or leave it" basis after she boarded the Spirit and wanted nothing more than to get her room assignment and rest before starting to work. The Agreement was also drafted in English, which made it difficult for Javier to read and understand given her limited command of the language.

Preliminarily, the Court rejects Javier's claim in her opposition brief that "Carnival fraudulently induced and fraudulently executed their contract with Maria Javier." (Doc. No. 15, p. 24.)  The elements of a cause of action for fraud are: (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009), and there is nothing in Javier's complaint to suggest that Carnival *defrauded* Javier.  What did Carnival knowingly misrepresent to her?  It is entirely unclear.

The Court also rejects Javier's argument that she was "led to believe her employment claims would be resolved under American law" because: Carnival is an American corporation headquartered in Miami, Florida; she was trained in and received employment-related correspondences from Miami; the Spirit embarks from American ports; and Spirit passengers' tickets stipulate that they must arbitrate all claims against Carnival in Miami under Florida law. (Doc. No. 15, p. 24–25.)  By Javier's own admission, Carnival employed Javier "for many years," and surely the Seafarer Agreement at issue in this case isn't the first one Javier has signed.  If she is sophisticated enough to draw inferences about the law that will govern her disputes with Carnival — even if those inferences are mistaken — she is sophisticated enough to read and comprehend an employment contract.  Indeed, it's disingenuous of Javier to say in her declaration that she "can not always comprehend English documents" (Doc. No. 17 ¶ 3) and then, to show she had no reason to believe she'd be forced to arbitrate her claims against Carnival in Panama, point to the fine print of a passenger ticket (Doc. No. 21-2) requiring Carnival passengers to arbitrate their claims in Florida.

Finally, the Court isn't moved by the fact that in *Bautista*, *Balen*, and *Rogers*, all maritime liability cases in which circuit courts compelled arbitration, the employment

contracts in play that contained arbitration provisions were negotiated by a union on a seaman's behalf. *See Bautista*, 396 F.3d at 1293–94, *Balen*, 583 F.3d at 651, and *Rogers*, 547 F.3d at 1158. To be sure, the fact that a seaman's employment contract is the result of a collective bargaining process may insulate it from the charge that it wasn't freely executed, but there is no indication in *Bautista*, *Balen*, or *Rogers* that a seafarer agreement won't be enforceable unless this is the case. To put the point another way, *Bautista*, *Balen*, and *Rogers* don't set a normative baseline of bargaining conditions that maritime employment contracts must satisfy in order to later be enforceable. *Bautista* even affirms that there is no "unequal bargaining power defense" to the enforceability of an arbitration agreement in the maritime employment context. *Bautista*, 396 F.3d at 1302. *See also Cardoso*, 2010 WL 996528 at *2 (citing *Bautista* and recognizing that being presented with a contract on a "take it or leave it" basis isn't a defense to the enforceability of that contract).

Javier well knows that there is substantial case law cutting against her argument that the circumstances under which she signed the Seafarer Agreement render it unenforceable. A number of courts have held that merely being in an inferior bargaining position, or being rushed to sign documents, doesn't taint a resulting contract. *See Bautista*, 396 F.3d at 1301–02; *Hodgson v. Royal Carribean Cruises*, No. 09-20798-CIV, 2009 WL 6364071 at *12 (S.D. Fla. Aug. 4, 2009) (a Hobson's choice to either accept a seafarer agreement and work or reject the agreement and disembark does not constitute duress); *Krstic v. Princess Cruise Lines, Ltd.*, No. 09-23846-CIV, 2010 WL 1542003 at *3 (S.D. Fla. Mar. 25, 2010) (disparity in bargaining power no defense to enforceability of resulting contract); *Polychronakis v. Celebrity Cruise Lines, Inc.*, No. 08-21806-CIV, 2008 WL 5191104 at *3 n. 2 (S.D. Fla. Dec. 10, 2008) (seafarer agreement still enforceable even though seafarer signed it "well into the voyage, at sea, and in the midst of performing his job"); and *Henriquez v. NCL (Bahamas) Ltd.*, No 09-21950-CIV, 2009 U.S. Dist. LEXIS 129453 at *10–11 (S.D. Fla. Nov. 19, 2009) (seafarer denied the opportunity to review a contract before signing it faced "a tough choice," not duress).

//

Against these cases, Javier relies largely on *Ferguson v. Countrywide Credit Industries, Inc.*, 298 F.3d 778 (9th Cir. 2002), in which the Ninth Circuit, applying California law, held that a disparity in bargaining power, coupled with the lack of a meaningful opportunity to negotiate, is a recipe for a procedurally unconscionable contract. *Ferguson* is distinguishable on two grounds. First, *Ferguson* involved a civil, domestic dispute, and so the peculiar interest in arbitration of *international* disputes isn't implicated. Indeed, the Supreme Court in *Mitsubishi* even contemplated that arbitration agreements that are *un*enforceable in the domestic context may be enforceable, nonetheless, in the international context. *Mitsubishi*, 473 U.S. at 629. Granted, this consideration speaks more to the arbitrability question than the question whether the Seafarer Agreement is a valid contract in the first place, but that brings the Court to its second point. To the extent Javier's Seafarer Agreement is enforceable, it is so under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Convention, the Eleventh Circuit has explained, recognizes a narrower range of contract defenses than domestic law. *See Bautista*, 396 F.3d at 1302–03.

Additionally, *Ferguson* doesn't map as neatly onto this case as Javier assumes. The question in *Ferguson* was whether a contract was unenforceable because it was unconscionable, and the Ninth Circuit explained that "there must be both a procedural and substantive element of unconscionability." *Ferguson*, 298 F.3d at 783. Even if the Seafarer Agreement was executed under less-than-ideal circumstances, the Court does not believe it is substantively defective in any meaningful way, which counsels against a finding that it is, in the aggregate, unconscionable.

For these reasons, the Court finds that the Seafarer Agreement is a valid, enforceable contract between Javier and Carnival.

**V.    Conclusion**

For the reasons given above, the Court finds that the arbitration clause of Javier's Seafarer Agreement does not contravene public policy and is therefore enforceable.

//

Additionally, the Seafarer Agreement is a valid contract in the first instance. Carnival's motion to compel arbitration is therefore **GRANTED**, and this case is **DISMISSED**.

The Court will pass on Javier's motion to amend her complaint to add a Seaman's Wage Act claim. For what it is worth, the inclusion of such a claim would not have impacted, at all, the Court's decision to compel arbitration in this case. It seems like Carnival has the better argument, anyway — the Seaman's Wage Act applies to *earned* wages that are wrongfully withheld or paid late — but Javier is welcome to raise the claim before the arbitrators and have them determine whether it entitles her to damages that her other claims do not.

**IT IS SO ORDERED**.

DATED: September 9, 2010

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge